AO 106 (Rev. 04/10)   Application for a Search Warrant

# UNITED STATES DISTRICT COURT

### for the
### Eastern District of California

FILED

JUN 0 8 2018

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

In the Matter of the Search of )
)
INFORMATION ASSOCIATED WITH APPLE )
ID BTSPRESENTS@ICLOUD.COM THAT IS )
STORED AT PREMISES CONTROLLED BY )
APPLE, INC. )

Case No.   2:18-SW- 497   EFB

SEALED

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

## SEE ATTACHMENT A, attached hereto and incorporated by reference.

located in the _____ Eastern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

## SEE ATTACHMENT B, attached hereto and incorporated by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S. Code § 371 | [conspiracy] |
| 18 U.S. Code § 641 | [theft of government property] |
| 18 U.S. Code § 1028A | [aggravated identity theft] |
| 18 U.S. Code § 1343 | [wire fraud] |
| 42 U.S. Code § 408 | [Social Security fraud] |

The application is based on these facts:

## SEE AFFIDAVIT, attached hereto and incorporated by reference.

☐ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Sean Fagan, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.
Date: _____ June 8, 2018 _____

_____
*Judge's signature*

City and state: Sacramento, California

Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

1  McGREGOR W. SCOTT
   United States Attorney
2  ROBERT J. ARTUZ
   Assistant United States Attorney
3  501 I Street, Suite 10-100
   Sacramento, CA 95814
4  Telephone: (916) 554-2700
   Facsimile: (916) 554-2900
5

6  Attorneys for Plaintiff
   United States of America
7

8              IN THE UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

11  In the Matter of the Search of:              CASE NO.

12  INFORMATION ASSOCIATED WITH          AFFIDAVIT IN SUPPORT OF AN APPLICATION
    APPLE ID BTSPRESENTS@ICLOUD.COM       FOR A SEARCH WARRANT
13  THAT IS STORED AT PREMISES
    CONTROLLED BY APPLE, INC.            **FILED UNDER SEAL**
14

15

16      I, Sean Fagan, being first duly sworn, hereby depose and state as follows:

17              **I.    INTRODUCTION AND AGENT BACKGROUND**

18      1.      I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§

19  2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereafter "Apple") to disclose to the

20  government records and other information, including the contents of communications, associated with

21  the above-listed Apple ID that is stored at premises owned, maintained, controlled, or operated by

22  Apple, a company headquartered at 1 Infinite Loop, Cupertino, CA. The information to be disclosed by

23  Apple and searched by the government is described in the following paragraphs and in Attachments A

24  and B.

25      2.      I am a Special Agent with the Social Security Administration's Office of Inspector

26  General, and have been since September 2017. I am currently assigned to the San Francisco Field

27  Division where I investigate threats against Social Security employees and facilities, employee

28  malfeasance, and Social Security fraud such as direct deposit fraud, identity theft, Social Security

AFFIDAVIT                                       1

1  Number misuse, and other types of fraud against Social Security programs. I have six years of prior

2  federal law enforcement experience as a Special Agent with the Diplomatic Security Service under the

3  U.S. Department of State where both domestically and internationally I investigated crimes such as

4  passport fraud, visa fraud, identity theft, employee malfeasance, and threats and other crimes involving

5  U.S. Government personnel, property, and information. In 2011, I completed the Federal Law

6  Enforcement Training Center's Criminal Investigator Training Program, a comprehensive 11-week

7  course that included training in electronic sources of information, conducting investigations in a cyber

8  environment, and financial aspects of investigations. I then completed the Diplomatic Security

9  Service's Basic Special Agent Course that included an additional 12 weeks of training in topics such as

10  dignitary protection, visa and passport fraud investigations, and international investigations.

11  Furthermore, over the course of my federal law enforcement career, I have worked with and received

12  guidance from other experienced investigators from various federal, state, local, and foreign law

13  enforcement agencies in the fields of general crimes, fraud, identity theft, financial crimes, digital

14  crimes, dignitary protection, kidnapping/hostage-taking, counterintelligence, and terrorism. Prior to

15  beginning my federal law enforcement career, I served in the U.S. Marine Corps for 10 years as an

16  infantryman and counterintelligence/human intelligence officer. I also hold a bachelor's of science in

17  criminal justice.

18       3.       The facts in this affidavit come from my personal observations, my training and

19  experience, and information obtained from other agents and witnesses. This affidavit is intended to

20  show simply that there is sufficient probable cause for the requested warrant and does not set forth all of

21  my knowledge about this matter.

22       4.       Based on my training and experience and the facts set forth in this affidavit, there is

23  probable cause to believe that former Social Security Administration (SSA) employee Eric Lemoyne

24  Willis and a subject named Darron Dimitri Ross engaged in, and continue to engage in, a conspiracy or

25  scheme involving unlawful acts including, without limitation: Willis using his official position at SSA to

26  gather the personally identifiable information of Social Security beneficiaries and using that information

27  to unlawfully divert the SSA benefits of at least 129 victims to fraudulently-created bank accounts

28  controlled by him or Ross. There is probable cause to believe that Willis and Ross committed violations

1  of at least 18 U.S. Code § 371 [conspiracy], 18 U.S. Code § 641 [theft of government property], 18 U.S.

2  Code § 1028A [aggravated identity theft], 18 U.S. Code § 1343 [wire fraud], and 42 U.S. Code § 408

3  [Social Security fraud].  There is also probable cause to search the information described in Attachment

4  A for evidence, instrumentalities, and fruits of these crimes further described in Attachment B.

## II.   JURISDICTION

6      5.      This Court has jurisdiction to issue the requested warrant because it is "a court of

7  competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), &

8  (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over

9  the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## III.   PROBABLE CAUSE

### Eric Willis

12     6.      SSA terminated Willis from employment on January 5, 2018.  At the time of his

13  termination, Willis was an Operations Supervisor at the SSA field office in Lodi, California where he

14  worked from February 7, 2016 to the date of his termination.  Prior to his reassignment to the Lodi

15  office, Willis was an Operations Supervisor at SSA's South Sacramento field office.  Willis started

16  working for SSA in 2003.

17     7.      As of June 1, 2018, through examining SSA records, I have identified 129 Social

18  Security retirement and disability beneficiaries whose benefits were unlawfully diverted to other bank

19  accounts ("drop accounts") and whose SSA records Willis accessed prior to each fraudulent change.

20  After Willis queried a given victim, an unidentified individual then made a phone call to an SSA field

21  office somewhere in the U.S. from a variety of apparent prepaid cellphone numbers (commonly referred

22  to as "burner phones"), used the victim's personally identifiable information to impersonate the victim

23  to an SSA employee, and then successfully changed the victim's direct deposit to a drop account.  SSA

24  then paid the victim's next Social Security payment to the drop account.  In most cases, the victim

25  contacted SSA after the first missing Social Security payment.  SSA then restored the original direct

26  deposit information and reissued the missing payment to the victim.  However, in some cases the victim

27  did not contact SSA for several months or more.

28

8.      SSA records show Willis used his SSA computer to access reports for each and every one of these 129 victims prior to the fraudulent direct deposit change. For approximately 33% of the victims, the fraudulent direct deposit changes were made within 30 days of Willis accessing their SSA records, approximately 75% of the direct deposit changes were made within 90 days, and approximately 98% were made within 180 days. The first known victim's direct deposit information was fraudulently changed on December 3, 2015. The most recent known victim's direct deposit was fraudulently changed on May 2, 2018. The total estimated theft loss for the 129 known victims is at least $393,000.

9.      I have found no explanation to justify an apparent 100% correlation between Willis' query of a given Social Security Number and the fraudulent direct deposit change which follows shortly thereafter. Since Willis worked in an SSA field office whose primary role is to serve the public within its geographic area of responsibility, it is notable that approximately 58% of the victims resided outside of the geographic service areas for the Lodi and South Sacramento SSA offices where Willis worked. More significantly, approximately 24% of the victims resided outside of the state of California entirely. Based on my training and experience, there is probable cause to believe that Willis accessed these victims' records for improper reasons, including to collect the personally identifiable information necessary to unlawfully change each victim's direct deposit to a drop account.

### Bank Records for Drop Accounts

10.      The Social Security benefits of the 129 beneficiaries were diverted to various drop accounts held at American Express National Bank, Green Dot, and Metabank. All three of these financial institutions offer prepaid debit cards available for purchase in a retail store or online. Many of these prepaid debit cards have the ability to receive direct deposits like a traditional bank account. Furthermore, since the accountholder information is usually provided online, it is easy to provide false accountholder information when setting up the account. Based on my training and experience, prepaid debit cards are commonly utilized in direct deposit fraud schemes against SSA.

11.      I have identified 43 American Express, Green Dot, and Metabank accounts that were used as drop accounts for the victims' Social Security benefits. Of these, I have examined bank records for 10 prepaid debit card accounts associated with approximately 50 victims between March 2016 and January 2018. After reviewing various records for the persons named on these 10 accounts and

1  speaking with several of the purported accountholders via phone, I believe the accountholders named on

2  the drop accounts are actually identity theft victims whose identities were used to open the drop

3  accounts without their knowledge.  The billing addresses listed on the 10 drop accounts are a variety of

4  Charlotte, North Carolina addresses.

5      12.      Counting debits of at least $50, the diverted Social Security payments were withdrawn

6  from the 10 drop accounts via approximately 340 transactions, the vast majority of which were cash

7  withdrawals of several hundred dollars each.  Based on my training and experience, the fact that the

8  funds in the drop accounts are overwhelmingly withdrawn in cash is indicative of criminal activity.

9  Approximately 73% of the withdrawals occurred in the Charlotte, North Carolina area, approximately

10  16% occurred in the southern California area (suggesting a southern California-based coconspirator),

11  and approximately 6% occurred in the Atlanta, Georgia area.  The remaining handful of withdrawals

12  occurred in Scottsdale, Arizona and Sandy, Utah.

13      13.      As one example, Green Dot account ending in 0799 is a drop account associated with

14  eight direct deposit, Social Security fraud victims.  Jeremy Davids is the individual listed as the

15  accountholder.  I spoke to Davids via phone: Davids stated he has never banked with Green Dot.

16      14.      In addition to the 10 drop accounts discussed above, more recently obtained bank records

17  indicate withdrawals from other drop accounts as recently as May 20, 2018.

18                              **Internet Access Logs for Drop Accounts**

19      15.      Via a grand jury subpoena, I examined logs of internet protocol (IP) addresses that were

20  used to access the drop accounts via the internet.  According to Green Dot records, IP address

21  76.248.20.51 was used on May 16, 2016 to access Green Dot account 0799.  According to AT&T, the

22  related internet service provider, IP address 76.248.20.51 was assigned to Willis' home internet service

23  on that date.  According to AT&T subscriber information, Willis subscribed to AT&T home internet

24  service at 40 Park City Court, Apartment 11205, Sacramento, California, from May 21, 2015 until

25  October 4, 2016.  A Wells Fargo account application in Willis' name and signed by Willis on October

26  24, 2015 lists the same address as his statement mailing address and street address.

27      16.      In addition to the occasion discussed above, there were approximately 255 other

28  occasions where the 10 accounts I reviewed were accessed via the internet between February 2016 and

1 August 2017. According to publicly available IP lookup tools, the majority of this activity was from IP
2 addresses in the Charlotte, North Carolina area. Based on my training and experience and other
3 information contained in this affidavit, this information is indicative of a coconspirator operating in the
4 Charlotte area.

**Bank Records for Eric Willis**

6     17.     I have reviewed bank records for accounts held in Willis' name at Mokelumne Federal
7 Credit Union, Sun Pacific Federal Credit Union, and Wells Fargo. During the period December 7, 2015
8 through November 20, 2017, there were 62 deposits into Willis' accounts totaling approximately
9 $74,000 where the source of the funds was not readily identifiable. With the exception of two deposits,
10 all appear to be cash deposits; the two exceptions were wire transfers totaling $5,150 from an account at
11 Compass Bank in Willis' name. Of the 62 deposits, six deposits totaling $10,240 occurred in the
12 Charlotte, North Carolina area and four deposits totaling $8,800 occurred in the San Diego, California
13 area. Based on my training and experience, I believe these unexplained cash deposits are composed of
14 Willis' illicit earnings from the direct deposit fraud scheme discussed in this affidavit.

**Darron Ross**

16     18.     Surveillance footage provided by First Citizens Bank shows an automated teller machine
17 (ATM) withdrawal from Green Dot drop account 0799 for $403.00 on June 17, 2017 at a First Citizens
18 Bank drive-thru ATM in Huntersville, North Carolina. In the footage, the person conducting the
19 withdrawal is driving a dark-colored Mercedes-Benz Sprinter van bearing North Carolina plates
20 EH4037. According to a North Carolina vehicle registration search conducted by Customs and Border
21 Protection's National Law Enforcement Communications Center, the vehicle is currently registered to
22 Darron Dimitri Ross, North Carolina driver's license number 38643319. The person conducting the
23 withdrawal appears to match Ross' driver's license photo.

24     19.     According to Green Dot, the debit card associated with the drop account ending in 1023
25 was ordered online and shipped to 1604 Oakdale Drive, Charlotte, North Carolina. This account is
26 associated with eight direct deposit fraud victims and there were more than 50 withdrawals using the
27 debit card shipped to this address. LexisNexis Accurint and official county records available online
28 associate this address with Ross' aunt, uncle, and cousins.

20.     The surname Ross is also Willis' mother's maiden name.  According to SSA records and the death certificate for Willis' mother, Willis' grandfather is "James Harrison Ross" or "James H. Ross."  According to SSA records, Darron Ross' great grandfather is "Harry Ross" or "James H. Ross."  If Willis and Ross share the common ancestor "James H. Ross," they are first cousins once removed.

21.     According to Officer Brian Tillack, Probation/Parole Officer, North Carolina Department of Public Safety, Ross is under his supervision for probation since February 2018 for identity theft-related offenses from August 2015 and January 2016.  Ross was under Officer Tillack's supervision for a previous period that ended in January 2017.  I provided Officer Tillack with still images of the aforementioned First Citizens Bank withdrawal conducted on June 17, 2017.  Additionally I provided still images of three other withdrawals at Sun Trust Bank ATMs from Green Dot drop account 1023 on March 17, 2017; May 9, 2017; and January 19, 2018.  Officer Tillack stated, "The first picture on 06/17/2017 is hard for me to tell.  The others are most certainly Mr. Ross."

22.     The Police Department of Mooresville, North Carolina, arrested Ross on the evening of January 30, 2016 for credit card fraud.  Based on my discussions with Detective Chris Jorgensen of Mooresville PD and review of the police reports, Mooresville PD had probable cause to believe that Ross had recently communicated with a coconspirator via text message on a cellphone from his vehicle to commit fraud.  On the day of Ross's arrest, Mooresville PD seized two cellphones in Ross's possession incident to his arrest, and it located and seized a third cellphone after a warrantless search of Ross's vehicle pursuant to probable cause.  Mooresville PD was able to determine that at least one of the seized phones was used to communicate with Ross's coconspirator.  The three cellphones seized from Ross include two Apple iPhone cellphones and a Samsung cellphone.

23.     Mooresville PD also seized a Wells Fargo Bank transaction receipt found in Ross' possession.  I examined a photograph of this receipt and found that the receipt was for a $4,000 cash deposit into a Wells Fargo bank account ending in 8228.  The deposit occurred at 12:51 PM on January 30, 2016, several hours prior to Mooresville PD's arrest of Ross.  The receipt indicated the deposit would be credited to the account on February 1, 2016.

24.     I compared the Wells Fargo transaction receipt seized from Ross to bank records for Wells Fargo account number 1288188228 held by Willis.  I located a deposit for $4,000 made in a

1  branch/store and credited to the account on February 1, 2016. I spoke to Wells Fargo who confirmed
2  that the $4,000 deposit listed on Willis' statement for account number 1288188228 was the same deposit
3  listed on the receipt seized from Ross. The deposit occurred at Wells Fargo branch number 67393
4  located at 1616 Central Ave in Charlotte, North Carolina. The Wells Fargo branch is located less than
5  30 miles from the location where Mooresville PD arrested Ross.

6      25.    Based on my training and experience, and the facts set forth in this affidavit, I believe
7  Ross deposited $4,000 of cash obtained through illicit means into the Wells Fargo account of Willis on
8  January 30, 2016, only hours prior to Mooresville PD's arrest of Ross the same day.

9                          **Telephone Contact Between Willis and Ross**

10     26.    T-Mobile toll records for Willis' phone number (916-710-3366) for the period
11  04/05/2017 to 02/27/2018 list 113 call records between Willis' phone number (916-710-3366) and Ross'
12  phone number (980-254-1979). A LexisNexis Accurint report associates phone number 980-254-1979
13  with Ross. Officer Tillack confirmed 980-254-1979 as a phone number he previously used to contact
14  Ross. T-Mobile records state Willis is the subscriber for phone number 916-710-3366 with service
15  effective 04/04/2017.

16     27.    After examining T-Mobile toll records for Willis' cellular phone number 916-710-3366
17  between April 2017 and February 2018, I found his text message (also known as short message service,
18  SMS) usage to be disproportionately low when compared to his voice call usage. For example, Willis'
19  T-Mobile toll records list a total of 9,916 calls and text messages. Approximately 747 (7.5%) of the
20  records are text messages; the remaining records are phone calls. In terms of daily usage, Willis
21  averaged over 25 calls per day to or from his mobile number. However, he only averaged
22  approximately two text messages per day.

23     28.    Furthermore, of Willis' top 15 most contacted numbers (defined as total calls and text
24  messages to or from that number), all of which appear to be cellular phone numbers capable of sending
25  and receiving text messages, only five have records of any text messages. With 113 call records, Ross'
26  phone (980-254-1979) is Willis' 13th most contacted number but they exchanged zero text messages.
27  Therefore, there is probable cause to believe that Willis uses a combination of other messaging services,

28

1 │ to include including Apple iMessages and email associated with Willis' Apple ID

2 │ BTSPRESENTS@ICLOUD.COM.

3 │ **Target Account(s)**

4 │     29.    A Wells Fargo account application bearing Willis' signature and dated October 12, 2016

5 │ lists Willis' email address as BTSPRESENTS@ICLOUD.COM.   A Mokelumne Federal Credit Union

6 │ application for electronic services in Willis' name and bearing Willis' signature dated March 30, 2016

7 │ lists Willis' email address as BTSPRESENTS@ICLOUD.COM.

8 │     30.    The following four documents found on Willis' SSA computer list Willis' email address

9 │ as BTSPRESENTS@ICLOUD.COM.

10 │     a.   Microsoft Word file named "ERIC WILLIS - RESUME" last modified on December 8,

11 │     2017.  The document is a resume in Willis' name that lists Willis' phone number as 916-

12 │     710-3366 and email as BTSPRESENTS@ICLOUD.COM.

13 │     b.   Microsoft Word file named "CDCR_Personal_History" last modified November 17,

14 │     2017.  The document is a Personal History Statement (form CDCR 1902) from the

15 │     California Department of Corrections and Rehabilitation, Office of Peace Officer

16 │     Selection, that indicates Willis applied for a correctional officer position.  The document

17 │     lists Willis' phone number as 916-710-3366 and email as

18 │     BTSPRESENTS@ICLOUD.COM.

19 │     c.   Microsoft Word document named "Eric's statement of qualification" last modified

20 │     November 15, 2017.  The document appears to be related to Willis seeking employment

21 │     and lists Willis' phone number as 916-710-3366 and email as

22 │     BTSPRESENTS@ICLOUD.COM.

23 │     d.   Microsoft Word document named "Super 90's Love Jam 2017 Event Sponsorship

24 │     Package" by Behind the Scenes Entertainment Group last modified September 16, 2016.

25 │     The document solicits sponsors for an event tentatively scheduled for February 12, 2017.

26 │     The document lists Willis as the point of contact and lists phone number 916-710-3366

27 │     and email BTSPRESENTS@ICLOUD.COM.

28 │

1    31.    SSA records shows email messages were exchanged between Willis' SSA email account
2  and BTSPRESENTS@ICLOUD.COM as recently as January 3, 2018.

3    32.    In addition to being an email account, the domain "iCloud.com" indicates
4  BTSPRESENTS@ICLOUD.COM is also an Apple ID. According to Apple's website, the Apple ID
5  must be used to access all Apple services. According to T-Mobile records, Willis uses a cellular phone
6  with serial number 353816089686952. According to Apple's website, this serial number is an iPhone 7
7  Plus. Therefore, based on my training and experience, the fact Willis is an active iPhone user indicates
8  he actively uses an Apple ID.

9                      **Probable Cause the Account(s) to be Searched**
10                              **Contain Evidence of a Crime**

11    33.    Based on my training and experience and the facts set forth in this affidavit, there is
12  probable cause to believe Willis and Ross engaged in, and continue to engage in, a conspiracy or scheme
13  to unlawfully divert the Social Security benefits of at least 129 victims. Given the geographic separation
14  of Willis in California from Ross in North Carolina, the two must use telephonic and electronic means of
15  communication to coordinate and carry out their scheme, as evidenced by the 113 call records between
16  Wills and Ross during an approximately 10-month period. The geographic separation of the
17  coconspirators, and the sheer volume and specificity of the information required to divert the Social
18  Security benefits of at least 129 victims to at least 43 drop accounts further illustrates the need to use
19  electronic means to record and exchange large amounts of information. There is probable cause to
20  believe that not only the contents of Willis' communications but also the contents of other documents,
21  files, and data associated with Willis' Apple ID will contain evidence of the scheme described in this
22  affidavit.

23    34.    The stored communications and files connected to an Apple ID may provide direct
24  evidence of the offenses under investigation. Based on my training and experience, instant messages,
25  emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal
26  activity, including to communicate and facilitate the offenses under investigation.

27    35.    For example, I believe iMessages and instant messages connected to Willis' Apple ID
28  contain evidence of the scheme described in this affidavit. When an iPhone user such as Willis

AFFIDAVIT                                    10

1  communicates with another phone number using the iPhone's default messaging app, Apple

2  automatically recognizes whether or not the other number is also an Apple device (e.g. iPhone, iPad,

3  iPod, etc.). If both phone numbers are Apple devices, the two devices will communicate via iMessages,

4  not via SMS text messages. Unless an iPhone user alters their phone's default settings, it is inevitable

5  for an iPhone user to send and receive iMessages because their iPhone will generally automatically send

6  an iMessage in lieu of a text message whenever the user exchanges messages with another iPhone user.

7      36.    Since iMessages are not text messages, they do not appear on toll records from the

8  cellular carrier. Therefore, if Ross also uses an iPhone, messages sent between Ross and Willis using

9  the default messaging app on their respective iPhones will be sent and received as iMessages, not SMS

10  messages, and thus would not appear on Willis' T-Mobile toll records. The Mooresville, North Carolina

11  Police Department seized two iPhones from Ross in an arrest on January 30, 2016. Therefore, there is

12  probable cause to believe that both Willis and Ross were iPhone users and therefore exchanged

13  iMessages.

14      37.    Based on my training and experience, email is one of the simplest, most readily available

15  means for Willis to exfiltrate Social Security information—such as the personally identifiable

16  information of direct deposit victims—from SSA's networks. Furthermore, email provides a ready

17  means for Willis to coordinate the direct deposit fraud scheme described with geographically distant

18  coconspirators such as Ross.

19      38.    Photographs and videos may evidence Willis' relationship to Ross or other

20  coconspirators, or may evidence Willis' location at a given date and time. In particular, smartphones

21  commonly embed location information into photographs taken using the phone's camera. This feature,

22  known as geotagging, identifies where the phone was located when the photo was taken. Furthermore,

23  in my training and experience, a photograph taken and shared with a mobile phone provides a

24  convenient, efficient means to share information related to the conspiracy such as victims' personally

25  identifiable information, drop account information, and information about the conspirators' bank

26  accounts.

27      39.    Internet browsing history and bookmarks stored in Willis' iCloud account may provide a

28  range of evidence regarding his involvement in the scheme described in this affidavit. For example,

1    browsing history may document occasions when Willis accessed the drop accounts via the internet or

2    conducted other activity in furtherance of the conspiracy or scheme.

3        40.    The identification of apps downloaded from App Store and iTunes Store may reveal

4    services used in furtherance of the crimes under investigation or services used to communicate with

5    coconspirators. For example, the download of a given financial institution's app evidences a financial

6    relationship with that bank. Alternatively, the download of a messaging app such as WhatsApp or

7    Facebook Messenger evidences use of that particular messaging service. In addition, emails, instant

8    messages, internet activity, documents, and contact and calendar information can lead to the

9    identification of coconspirators and instrumentalities of the crimes under investigation.

10        41.    In my training and experience, evidence of who was using an Apple ID and from where,

11   and evidence related to criminal activity of the kind described above, may be found in the various files

12   and records described in this affidavit. This evidence may establish the "who, what, why, when, where,

13   and how" of the criminal conduct under investigation, thus enabling the United States to establish and

14   prove each element or, alternatively, to exclude the innocent from further suspicion.

15        42.    In addition, the user's account activity, logs, stored electronic communications, and other

16   data retained by Apple can indicate who has used or controlled the account. This "user attribution"

17   evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a

18   residence. For example, subscriber information, email and messaging logs, documents, and photos and

19   videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence

20   of who used or controlled the account at a relevant time. As an example, because every device has

21   unique hardware and software identifiers, and because every device that connects to the Internet must

22   use an IP address, IP address and device identifier information can help to identify which computers or

23   other devices were used to access the account. Such information also allows investigators to understand

24   the geographic and chronological context of access, use, and events relating to the crime under

25   investigation.

26        43.    Account activity may also provide relevant insight into the account owner's state of mind

27   as it relates to the offenses under investigation. For example, information on the account may indicate

28   the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime),

1  or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law

2  enforcement).

3      44.     Therefore, Apple's servers are likely to contain stored electronic communications and

4  information concerning subscribers and their use of Apple's services.  In my training and experience,

5  such information may constitute evidence of the crimes under investigation including information that

6  can be used to identify the account's user or users.

7      45.     Lastly, there is probable cause to believe Willis, Ross, and any other coconspirators

8  communicated about, and took steps in furtherance of, the fraud scheme discussed in this affidavit prior

9  to the first known fraudulent direct deposit change for victim Paul Banh on December 3, 2015 and that

10  Apple's servers contain evidence of their communications.  Based on my training and experience, I

11  believe their fraud scheme required at least one month of preparation before the first fraudulent direct

12  deposit change was made.  The coconspirators needed this time to formulate the plan, agree on the plan,

13  and then carry out steps of the plan which preceded the first known direct deposit change.  Such

14  preceding steps must include identifying potential victims, retrieving the victims' personally identifiable

15  information from SSA systems, and opening drop accounts through which to receive the victims'

16  diverted Social Security benefits.

17          **IV.    INFORMATION REGARDING APPLE ID AND ICLOUD[1]**

18      46.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of

19  which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating

20  system.

21      47.     Apple provides a variety of services that can be accessed from Apple devices or, in some

22  cases, other devices via web browsers or mobile and desktop applications ("apps").  As described in

23  further detail below, the services include email, instant messaging, and file storage:

24

25      [1]     The information in this section is based on information published by Apple on its
    website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement
26  Legal Process Guidelines," available at http://images.apple.com/privacy/docs/legal-process-guidelines-
    us.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993;
27  "iCloud," available at http://www.apple.com/icloud/; "What does iCloud back up?," available at
    https://support.apple.com/kb/PH12519; "iOS Security," available at
28  https://www.apple.com/business/docs/iOS_Security_Guide.pdf, and "iCloud: How Can I Use iCloud?,"
    available at https://support.apple.com/kb/PH26502.

a. Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b. iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c. iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

d. iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f. Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

g. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

48. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

49. An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

50. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet

1  Protocol address ("IP address") used to register and access the account, and other log files that reflect

2  usage of the account.

3       51.     Additional information is captured by Apple in connection with the use of an Apple ID to

4  access certain services.  For example, Apple maintains connection logs with IP addresses that reflect a

5  user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and

6  the My Apple ID and iForgot pages on Apple's website.  Apple also maintains records reflecting a

7  user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query

8  logs" for iMessage, and "mail logs" for activity over an Apple-provided email account.  Records relating

9  to the use of the Find My iPhone service, including connection logs and requests to remotely lock or

10  erase a device, are also maintained by Apple.

11       52.     Apple also maintains information about the devices associated with an Apple ID.  When

12  a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and

13  identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the

14  device's SIM card.  Similarly, the telephone number of a user's iPhone is linked to an Apple ID when

15  the user signs in to FaceTime or iMessage.  Apple also may maintain records of other device identifiers,

16  including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"),

17  and the serial number.  In addition, information about a user's computer is captured when iTunes is used

18  on that computer to play content associated with an Apple ID, and information about a user's web

19  browser may be captured when used to access services through icloud.com and apple.com.  Apple also

20  retains records related to communications between users and Apple customer service, including

21  communications regarding a particular Apple device or service, and the repair history for a device.

22       53.     Apple provides users with five gigabytes of free electronic space on iCloud, and users

23  can purchase additional storage space.  That storage space, located on servers controlled by Apple, may

24  contain data associated with the use of iCloud-connected services, including: email (iCloud Mail);

25  images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents,

26  spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-

27  Fi network information (iCloud Tabs and iCloud Keychain).  iCloud can also be used to store iOS

28  device backups, which can contain a user's photos and videos, iMessages, Short Message Service

1  ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history,

2  contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data.

3  Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS

4  app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant

5  messages on iCloud Drive.  Some of this data is stored on Apple's servers in an encrypted form but can

6  nonetheless be decrypted by Apple.

### V.       INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

8          54.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in

9  particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple

10  to disclose to the government copies of the records and other information (including the content of

11  communications and stored data) particularly described in Section I of Attachment B.  Upon receipt of

12  the information described in Section I of Attachment B, government-authorized persons will review that

13  information to locate the items described in Section II of Attachment B.

### VI.      CONCLUSION

15          55.     Based on the forgoing, I request that the Court issue the proposed search warrant.

16  Because the warrant will be served on APPLE, INC. who will then compile the requested records at a

17  time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any

18  time in the day or night.

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

## VII.    REQUEST FOR SEALING

56.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Sean Fagan
Special Agent
Social Security Administration Office
of the Inspector General

Subscribed and sworn to before me on:    June 8, 2018

The Honorable Edmund F. Brennan
UNITED STATES MAGISTRATE JUDGE

Approved as to form by AUSA ROBERT J. ARTUZ

AFFIDAVIT                                                18

**ATTACHMENT A**

**Property to Be Searched**

This warrant applies to information associated with APPLE ID

BTSPRESENTS@ICLOUD.COM that is stored at premises controlled by APPLE, INC., a

company headquartered at Apple Inc., 1 Infinite Loop, Cupertino, CA 95014.

1

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be disclosed by Apple**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Apple, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

a.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.     All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

2

c.     The contents of all emails associated with the account November 1, 2015 to present, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d.     The contents of all instant messages associated with the account November 1, 2015 to present, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e.     The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f.     All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple

3

services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

      g.      All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

      h.      All records pertaining to the types of service used;

      i.      All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

      j.      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

      The Provider is hereby ordered to disclose the above information to the government within **14 days** of service of this warrant.

4

II.     **Information to be seized by the government**

All information described above in Section I that constitutes evidence, instrumentalities, and/or fruits of violations of 18 U.S. Code § 371 [conspiracy], 18 U.S. Code § 641 [theft of government property], 18 U.S. Code § 1028A [aggravated identity theft], 18 U.S. Code § 1343 [wire fraud], and 42 U.S. Code § 408 [Social Security fraud] involving Eric Lemoyne Willis since November 1, 2015, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a)     The identity of the person(s) who created or used the Apple ID, including records that help reveal the whereabouts of such person(s);

(b)     Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crime under investigation and the account subscriber;

(c)     Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

(d)     Evidence indicating the subscriber's state of mind as it relates to the crime under investigation;

(e)     Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts;

(f)     Any correspondence, communication, photograph, or other data concerning Social Security programs or containing the personally identifiable information of individuals other than Eric Willis; any correspondence, communication, or data evidencing an agreement, plan, practice, or other evidence of a scheme or conspiracy to defraud Social Security beneficiaries or Social Security programs; and any correspondence, communication, or data evidencing acts or steps taken to further that scheme or conspiracy, whether inherently unlawful or not;

(g)     Lists of Social Security fraud or identity theft victims, or their personally

5

identifiable information;

(h)     The contents of any communication in whatever form between Eric Willis and any other person, including Darron Ross, identified to be involved in a conspiracy or scheme to defraud Social Security beneficiaries or Social Security programs;

(i)     Data evidencing the access or use of any American Express, Green Dot, or Metabank prepaid bank accounts (i.e., drop accounts) used to defraud Social Security beneficiaries or Social Security programs;

(j)     Data evidencing the transfer of illicitly obtained funds from drop accounts to any bank accounts held in the name of Eric Willis or any other person, including Darron Ross, identified to be involved in a conspiracy or scheme to defraud Social Security beneficiaries or Social Security programs; and

(k)     Any and all location data, and any information recording Eric Willis' schedule or travel from 11/01/15 to the present.

6

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of<br><br>INFORMATION ASSOCIATED WITH APPLE ID<br>BTSPRESENTS@ICLOUD.COM THAT IS STORED<br>AT PREMISES CONTROLLED BY APPLE, INC. | )<br>)<br>)  Case No. 2:18-SW-497 EFB<br>)<br>) |

**SEALED**

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____California_____ *(identify the person or describe the property to be searched and give its location):*

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized):*

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____06/22/2018_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: any authorized U.S. Magistrate Judge in the Eastern District of California.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:     June 8, 2018 _____

City and state:     Sacramento, California _____

_____
*Judge's signature*

Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.


_____        _____
Signature of Judge                                                    Date

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with APPLE ID

BTSPRESENTS@ICLOUD.COM that is stored at premises controlled by APPLE, INC., a

company headquartered at Apple Inc., 1 Infinite Loop, Cupertino, CA 95014.

1

## **ATTACHMENT B**

### **Particular Things to be Seized**

**I.     Information to be disclosed by Apple**

To the extent that the information described in Attachment A is within the possession,

custody, or control of Apple, regardless of whether such information is located within or outside

of the United States, including any messages, records, files, logs, or information that have been

deleted but are still available to Apple, or have been preserved pursuant to a request made under

18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government,

in unencrypted form whenever available, for each account or identifier listed in Attachment A:

a.     All records or other information regarding the identification of the account, to

include full name, physical address, telephone numbers, email addresses (including primary,

alternate, rescue, and notification email addresses, and verification information for each email

address), the date on which the account was created, the length of service, the IP address used to

register the account, account status, associated devices, methods of connecting, and means and

source of payment (including any credit or bank account numbers);

b.     All records or other information regarding the devices associated with, or used in

connection with, the account (including all current and past trusted or authorized iOS devices

and computers, and any devices used to access Apple services), including serial numbers, Unique

Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers

("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers

("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"),

Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber

Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers

("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile

Station Equipment Identities ("IMEI");

2

c.       The contents of all emails associated with the account November 1, 2015 to present, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d.       The contents of all instant messages associated with the account November 1, 2015 to present, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e.       The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f.       All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple

3

services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

  g. All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

  h. All records pertaining to the types of service used;

  i. All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

  j. All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

  The Provider is hereby ordered to disclose the above information to the government within **14 days** of service of this warrant.

4

**II.     Information to be seized by the government**

All information described above in Section I that constitutes evidence, instrumentalities, and/or fruits of violations of 18 U.S. Code § 371 [conspiracy], 18 U.S. Code § 641 [theft of government property], 18 U.S. Code § 1028A [aggravated identity theft], 18 U.S. Code § 1343 [wire fraud], and 42 U.S. Code § 408 [Social Security fraud] involving Eric Lemoyne Willis since November 1, 2015, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a)     The identity of the person(s) who created or used the Apple ID, including records that help reveal the whereabouts of such person(s);

(b)     Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crime under investigation and the account subscriber;

(c)     Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

(d)     Evidence indicating the subscriber's state of mind as it relates to the crime under investigation;

(e)     Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts;

(f)     Any correspondence, communication, photograph, or other data concerning Social Security programs or containing the personally identifiable information of individuals other than Eric Willis; any correspondence, communication, or data evidencing an agreement, plan, practice, or other evidence of a scheme or conspiracy to defraud Social Security beneficiaries or Social Security programs; and any correspondence, communication, or data evidencing acts or steps taken to further that scheme or conspiracy, whether inherently unlawful or not;

(g)     Lists of Social Security fraud or identity theft victims, or their personally

5

identifiable information;

(h)     The contents of any communication in whatever form between Eric Willis and any other person, including Darron Ross, identified to be involved in a conspiracy or scheme to defraud Social Security beneficiaries or Social Security programs;

(i)     Data evidencing the access or use of any American Express, Green Dot, or Metabank prepaid bank accounts (i.e., drop accounts) used to defraud Social Security beneficiaries or Social Security programs;

(j)     Data evidencing the transfer of illicitly obtained funds from drop accounts to any bank accounts held in the name of Eric Willis or any other person, including Darron Ross, identified to be involved in a conspiracy or scheme to defraud Social Security beneficiaries or Social Security programs; and

(k)     Any and all location data, and any information recording Eric Willis' schedule or travel from 11/01/15 to the present.